AUSA: Isabel C. Pitaro

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

26 MAG 3386

UNITED STATES OF AMERICA

v.

JEFFREY THEN,

Defendant.

**COMPLAINT**

Violations of 18 U.S.C. §§ 1951 and 2

COUNTY OF OFFENSE:
BRONX

SOUTHERN DISTRICT OF NEW YORK, ss.:

KERRI KUHL, being duly sworn, deposes and says that she is a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and charges as follows:

**COUNT ONE**
**(Conspiracy to Commit Hobbs Act Robbery)**

1. On or about July 30, 2026, in the Southern District of New York and elsewhere, JEFFREY THEN, the defendant, and others known and unknown, knowingly combined, conspired, confederated, and agreed together and with each other to commit robbery, as that term is defined in Title 18, United States Code, Section 1951(b)(1), and would and did thereby obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), to wit, THEN agreed with others to rob the proprietor of a jewelry store operating out of an apartment in the Bronx, New York that sold jewelry, handbags, and perfume.

(Title 18, United States Code, Section 1951.)

**COUNT TWO**
**(Hobbs Act Robbery)**

2. On or about July 30, 2026, in the Southern District of New York and elsewhere, JEFFREY THEN, the defendant, and others known and unknown, knowingly committed robbery, as that term is defined in Title 18, United States Code, Section 1951(b)(1), and would and did thereby obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), and aided and abetted the same, to wit, THEN robbed the proprietor of a jewelry store operating out of an apartment in the Bronx, New York that sold jewelry, handbags, and perfume.

(Title 18, United States Code, Sections 1951 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

3. I am a Special Agent with the ATF, and I have been involved in the investigation of this matter. I base this affidavit on my own personal experience investigating crimes involving firearms and robberies, as well as related offenses; my conversations with other law enforcement personnel; my participation in witness interviews; and my examination of various reports, recordings, photographs, records, and videos, including surveillance footage. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

4. As explained below, JEFFREY THEN, the defendant, and other individuals organized and committed a robbery of an individual ("Victim-1") operating a luxury goods store out of an apartment in the Bronx, New York (the "Robbery"). During the Robbery, THEN and his co-conspirators pistol-whipped Victim-1, tied Victim-1 up with duct tape, assaulted and threatened Victim-1, and stole hundreds of thousands of dollars in jewelry and other merchandise, along with approximately $40,000 in U.S. currency that Victim-1 used in connection with the business.

**The July 30, 2026 Robbery**

5. Based on my participation in this investigation, my conversations with other law enforcement officers, my participation in witness interviews, my review of video surveillance footage and related photographs, and my review of law enforcement reports and records, I have learned, among other things, the following regarding the Robbery:

a. On or about July 30, 2026, at approximately 10:16 p.m., three men wearing dark clothing, hats, and masks entered a residential building in the Bronx and walked up the stairs to Victim-1's apartment. As explained below, one of these individuals was later identified as JEFFREY THEN, the defendant, and carried what appears to be a handgun during the Robbery.

b. Victim-1 sold jewelry, handbags, and perfume out of her Bronx apartment, and in doing so transacted in interstate commerce by selling and reselling goods manufactured outside New York State. Victim-1 solicited customers for her business through word of mouth and also advertised her merchandise on online messaging platforms like WhatsApp. Victim-1 also used WhatsApp and other internet platforms for prospective customers to make appointments to look at and purchase the luxury goods offered for sale. Shortly before the Robbery, Victim-1 had been contacted over WhatsApp by an individual purportedly seeking an appointment to buy some of the luxury goods that Victim-1 advertised online.

c. Security camera footage outside Victim-1's apartment and the apartment of Victim-1's downstairs neighbor captured the three men as they walked up the stairs of the building and entered Victim-1's apartment. The first man to enter Victim-1's apartment ("CC-1") wore a black sweater emblazoned with white writing and white sneakers. CC-1 is depicted in the pictures

below walking towards Victim-1's apartment (Image-1) and then entering Victim-1's apartment (Image-2).



(Image-1)



(Image-2)

d. The second man to enter Victim-1's apartment, whom, as explained below, I have since identified as THEN, wore a black hat with a distinct flag logo on the front, black sneakers with white soles, and a black backpack. THEN carried what appears to be a black pistol, and as he walked into Victim-1's apartment, THEN racked the slide of the pistol, which I know from my training and experience is when you pull back and release the slide. The pictures below, taken from security camera footage, show THEN walking up the stairs to Victim-1's apartment (Image-3) and "racking" (Image-4) and displaying (Image-5) the pistol as he entered the apartment. The red circles show THEN's distinctive shoes, hat, and backpack, along with the pistol that he carried and racked before entering Victim-1's apartment.



(Image-3)


(Image-4)


(Image-5)

e. The third man to enter Victim-1's apartment ("CC-2") wore a backwards black baseball cap with a visible logo on the back, white sneakers, a dark colored shirt with white writing on the back and sleeves, and black pants with a red and yellow logo. CC-2 is depicted below in images taken from security camera footage walking up the stairs to Victim-1's apartment (Image-6 and Image-7), and entering Victim-1's apartment (Image-8). The distinctive logos on CC-2's clothing are circled in red.


(Image-6)


(Image-7)


(Image-8)

f. After entering Victim-1's apartment, THEN, CC-1, and CC-2 (together, the "Robbers") pistol-whipped Victim-1, pointed the gun at her face, shoved her, dragged her around the apartment, and covered her face with a pillow. Victim-1 suffered physical injuries from the assault, including a wound on her head. The Robbers forced Victim-1 to remove her clothing and bound her hands and feet with duct tape.

g. The Robbers screamed at Victim-1, asking her where the money and the jewelry were and threatened to kill her. One of the Robbers held Victim-1 at gunpoint while the other two searched the apartment. The Robbers took from Victim-1 approximately $40,000 in cash, hundreds of thousands of dollars of jewelry, handbags worth a total of approximately $3,000, and perfume worth a total of approximately $2,000. The jewelry, handbags, and perfume that the Robbers stole were items Victim-1 intended to sell as part of Victim-1's business. The Robbers also took Victim-1's cellphone and the security cameras she had installed both outside of and inside Victim-1's apartment. When they fled the apartment, the Robbers left Victim-1 injured, naked, and bound by duct tape.

h. Approximately 30 minutes later, at approximately 10:46 p.m., the Robbers left Victim-1's apartment, moving quickly down the building's stairs. Image-9 depicts THEN and CC-2 walking down the building stairs away from Victim-1's apartment. Image-10 depicts CC-1 walking down the building stairs away from Victim-1's apartment. As is apparent in Image-9, THEN was carrying the same backpack that he had carried when he entered Victim-1's apartment prior to the Robbery (circled in red in Image-9, below), but it appeared fuller than it had been when he entered the apartment.




(Image-9)




(Image-10)

**<u>Identification of JEFFREY THEN as one of the Robbers</u>**

6. Based on my participation in this investigation, my conversations with other law enforcement officers, my participation in witness interviews, my review of records and reports, and my review of video surveillance footage and photographs, I believe that JEFFREY THEN, the defendant, was one of the perpetrators of the Robbery and carried what appears to be a pistol into Victim-1's apartment. Specifically, I have learned, among other things, the following:

a. Approximately one hour before the Robbery, at approximately 9:04 p.m., on or about July 30, 2026, THEN exited an apartment in the Bronx (the "THEN Apartment") wearing the same black hat with a distinct logo on the front and the same black sneakers with a white sole (circled in red below) that he wore during the Robbery (as can be seen in Image-3, Image-4, and Image-5, above). I recognize THEN based on my involvement in this investigation, including the investigative steps described below, as well as my review and comparison of the below and above-described images and videos of THEN with law enforcement body camera footage and photographs of THEN from prior encounters with the New York City Police Department. When he exited the THEN Apartment, THEN wore a short-sleeved black t-shirt.


(Image-11)


(Image-12)

b. Based on my review of security camera footage, a prior law enforcement encounter with THEN on or about May 20, 2026, which took place outside the building in which the THEN Apartment is located (the "THEN Building") and during which THEN referred to "[his] house" as being "upstairs," and "inside" in reference to the THEN Building, and conversations with the superintendent for the building, who identified THEN by name, I believe that THEN lives in the THEN Apartment.

c. Approximately 14 minutes before the Robbery, at approximately 10:02 p.m.[1] on or about July 30, 2026, as depicted in Image-13, a white BMW X5 with a Pennsylvania license plate (the "White BMW") entered a parking lot in the Bronx (the "Bronx Parking Lot"). The Bronx Parking Lot is located approximately a nine-minute walk and a four-minute drive from

[1] The Bronx Parking Lot surveillance cameras run approximately 10 hours and 40 minutes ahead.

Victim-1's apartment. The White BMW is registered to a woman who shares THEN's last name and who identified herself to law enforcement as THEN's sister during a past encounter.




(Image-13)

d. I know from NYPD records that THEN regularly drives the White BMW. Specifically, NYPD officers have had multiple law enforcement encounters with THEN while he was either driving or had access to the White BMW in or about November 2025, May 2026, and July 2026 (*i.e.*, the same month as the Robbery). Images obtained from body camera footage from the November 2025 (Image-15) and May 2026 (Image-14) encounters between THEN and law enforcement are depicted below. From my involvement in this investigation, I recognize THEN as the man standing outside the White BMW in Image-14.




(Image-14)




(Image-15)

e. The profile photo associated with THEN's Instagram account shows THEN sitting behind the wheel of a BMW with black leather seats that appear to be the same color as the seats in the White BMW (depicted below, in Image-16, is THEN's Instagram profile photo, and

on the right, in Image-17, is a still image from NYPD body camera footage of a prior law enforcement encounter that shows THEN standing outside the White BMW in or about May 2026).



(Image-16)




(Image-17)

f. After the White BMW entered the Bronx Parking Lot, an individual whom I believe to be THEN, circled in red in Image-18 below, exited from the driver's side of the vehicle. An individual whom I believe to be CC-1, circled in yellow in the image below, exited from the passenger side of the vehicle, as depicted below.



(Image-18)

g. After exiting the White BMW, CC-1 walked around the back of the vehicle while talking on a cellphone. As depicted below in Image-19, CC-1 was wearing the same black sweatshirt with white writing that he wore at the time of the Robbery as depicted in Image-1.



(Image-19)

h. After exiting the White BMW, THEN, who was still wearing the black short-sleeved t-shirt he wore when he left the THEN Apartment that evening (as shown in Images-11 and -12 above), and the same distinctive baseball cap (circled in red below) that he wore both when he left the THEN Apartment and during the Robbery (as shown in Images -4 and -11 above) also walked around the back of the White BMW and retrieved a black sweatshirt and a black backpack (circled in red in Images-21 through -23 below) from the White BMW. While holding the backpack, THEN put on the black sweatshirt, as depicted in Image-21 and Image-22 below. At approximately 10:03 p.m., *i.e.*, approximately thirteen minutes before the Robbery, THEN and CC-1 walked out of the Bronx Parking Lot together, as shown in Image-23 (the backpack and CC-1's white sneakers are circled in red).



(Image-20)



(Image-21)




(Image-22)




(Image-23)

i. After leaving the Bronx Parking Lot, THEN and CC-1 met up with third individual who, as described below, I believe to be CC-2 based on the clothing he was wearing. At approximately 10:11 p.m. (*i.e.*, approximately five minutes before the Robbery), surveillance footage captured THEN, CC-1, and CC-2 walking together on Victim-1's block in the direction of Victim-1's apartment. In the footage, THEN, now wearing a black mask consistent with the one he wore during the Robbery, is carrying a black backpack (circled in red in Image-24) and wearing

the same distinctive hat (circled in red in Image-25) described and pictured above in Images-3, -4, -9, -11, and 20-23.



(Image-24)



(Image-25)

j. Approximately two minutes after the Robbery, at approximately 10:48 p.m., surveillance footage captured a man whom I believe to be THEN based on his clothing (including the hat and shoes described above) walking away from Victim-1's apartment on the same street as Victim-1's apartment building.



(Image-26)



(Image-27)

k. At approximately 11:01 p.m., the same individual (whom I believe to be THEN based on his distinctive clothing, which is circled in red in the images below) returned to the Bronx Parking Lot alone and carrying what appears to be the same backpack (also circled in red in the images below) he had previously removed from the White BMW and carried into Victim-1's apartment (Image-28). THEN spoke with the parking attendant to identify where the White BMW was parked (Image-29), walked in that direction, retrieved a motorized standing scooter (the "Scooter"), and departed the Bronx Parking Lot on the Scooter, still carrying the backpack (Image-30).


(Image-28)


(Image-29)


(Image-30)

l. Next, each of the Robbers separately made their way towards the THEN Building and up to the THEN Apartment.

m. At approximately 11:04 p.m., THEN arrived at the THEN Building using the Scooter. I recognize the individual depicted in the images below as THEN because of the backpack he is carrying, as well as the clothing he is wearing, including the hat with the flag logo and black sneakers with a white sole, which were worn by THEN that same evening in the times before, during, and immediately after the Robbery, as shown in Images-3 through -30. Images of THEN entering the THEN Building carrying the backpack, which is circled in red (Image-31), walking through the lobby carrying the same backpack and wearing the same distinctive hat and

shoes, which are circled in red (Image-32), and on the phone inside the lobby of the THEN Building (Image-33) are displayed below.






(Image-31) (Image-32) (Image-33)

n. When THEN exited the elevator on the third floor (Image-34), he walked up to and entered the THEN Apartment, followed closely behind by CC-1 (again, wearing the same clothing CC-1 had worn before and during the Robbery), who had been waiting on the steps near the hallway (Image-35 and -36). THEN is circled in red in the images below and CC-1 and his distinctive clothing is circled in yellow. Minutes later, CC-2 (wearing the same pants with red and yellow logos, shirt with white writing on the back, and white shoes that he was wearing at the time of the Robbery) entered the THEN Building, took the stairs to the third floor, and entered the THEN Apartment.





(Image-34) (Image-35) (Image-36)

o. Shortly before midnight on or about July 30, 2026, security footage shows that CC-1 and CC-2 left the THEN Apartment but THEN did not. At approximately 12:04 a.m., THEN briefly left the THEN Apartment to dispose of garbage wearing the same shoes that he had

worn during the Robbery, before returning to the THEN Apartment, as shown in Image-37 and Image-38 below.


(Image-37)


(Image-38)

p. At approximately 8:13 a.m. on or about July 31, 2026, *i.e.*, the morning after the Robbery, THEN left the THEN Apartment with the Scooter. He wore a black t-shirt with a white logo on the front, a black baseball cap with a blue logo on the front, and gray sneakers, as shown below in Image-39.


(Image-39)

q. At approximately 9:34 a.m. on or about July 31, 2026, THEN arrived at the Bronx Parking Lot wearing the same t-shirt, baseball cap, and gray sneakers that he had worn when

he left the THEN Apartment that morning. Approximately three minutes later, the White BMW, which bears the same plate number as the vehicle depicted in Image-15, exited the Bronx Parking Lot, as shown below in Image-40 and Image-41.



(Image-40)




(Image-41)

*This space left intentionally blank.*

r. On August 19, 2026, law enforcement executed a judicially authorized search warrant on the THEN Apartment. Among other items, law enforcement recovered a hat that appears to be the one worn by THEN during the Robbery, a backpack that appears to be the one carried by THEN during the Robbery, a scooter that appears to be the one used by THEN after the Robbery, and a black pistol-style BB gun with what appears to be blood on it.

WHEREFORE, I respectfully request that JEFFREY THEN, the defendant, be imprisoned or bailed, as the case may be.

Kerri Kuhl
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Sworn to me through the transmission of this Complaint by reliable electronic means (telephone), this 19th day of August, 2026.

THE HONORABLE ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK